## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENJAMIN STRUSOWSKI and ALLISON CLAUGES, for themselves and others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>THE NEMOURS FOUNDATION,<br><br>       Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Benjamin Strusowski and Allison Clauges ("Plaintiffs"), on behalf of themselves and all other similarly situated individuals (the "Class Members"), bring this action against The Nemours Foundation ("Nemours" or "Defendant") which operates, controls, and manages the Nemours Children's Health System.  Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all individuals who have accessed the Nemours app (the "App" or "Nemours App") and/or Nemours websites (the "Websites" or "Nemours Websites") that Defendant owns and operates, including, but not limited to: nemours.org and online-scheduling.nemours.org.

1

2.      Defendant aids, employs, agrees, and conspires with Facebook/Meta[1] to intercept communications sent and received by Plaintiffs and Class Members, including communications containing protected medical information.  Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5 million, and many members of the class are citizens of states different from Defendant.

4.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      The Court has general personal jurisdiction over Defendant because Nemours resides in and does business in the Commonwealth of Pennsylvania (the "Commonwealth").

6.      Additionally, the Court has specific personal jurisdiction over Defendant because a substantial part of the events giving rise to the claims occurred in the Commonwealth.  Plaintiff Benjamin Strusowski accessed the Nemours App and Website from his home, located in Landenberg, Pennsylvania.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred within this District.

---

[1] In October 2021, Facebook, Inc. changed its name to Meta, Inc.  Unless otherwise indicated, Facebook, Inc. and Meta, Inc. are referenced collectively herein as "Facebook."

## THE PARTIES

### *Plaintiff Strusowski*

8.      Plaintiff Benjamin Strusowski is an adult citizen of the Commonwealth and is domiciled in Landenberg, Pennsylvania.

9.      Between 2018 to 2022, Plaintiff Strusowski used the Nemours App and/or Websites to schedule an appointment and access medical results.  Plaintiff Strusowski accessed the App and/or Website using a tablet and desktop computer.

10.      Each time that Plaintiff Strusowski used the Nemours App and/or Websites, he did so from his home, in Landenberg, Pennsylvania.

11.      As described below, each time Plaintiff Strusowski booked medical appointments, he disclosed medical information regarding his medical condition, history, or treatment.

12.      Plaintiff Strusowski also has an active Facebook account which he has maintained since 2017.  Plaintiff Strusowski accesses his Facebook account from multiple devices, including his tablet, smartphone and desktop computer.

### *Plaintiff Clauges*

13.      Plaintiff Allison Clauges is an adult citizen of New Jersey and is domiciled in Shamong, New Jersey.

14.      Between February 2019 and April 2021, Plaintiff Clauges used the Nemours App and Websites to schedule appointments, access medical records, and complete medical history questionnaires on behalf of her daughter.  Plaintiff Clauges accessed the App using a mobile phone, and she accessed the Websites using a laptop computer.

15.    Plaintiff Clauges accessed the Nemours App and/or Websites to privately exchange information with Nemours' Cherry Hill, New Jersey and Wilmington, Delaware locations.

16.    As described below, each time Plaintiff Clauges booked medical appointments, she disclosed medical information regarding her daughter's medical condition, history and/or treatment.

17.    Plaintiff Clauges also has an active Facebook account which she has maintained since at least February 2019.  Plaintiff Clauges accesses her Facebook account from multiple devices, including her tablet, smartphone and desktop computer.

***Defendant***

18.    Defendant is a registered nonprofit entity with its principal place of business in Florida.  Through the Nemours Children's Health System, Defendant provides comprehensive medical care to thousands of infants, children, teens, and young adults each year, including through its Nemours Children's Health locations in Abington, Bryn Mawr, Collegeville, Concordville, Exton, Glen Mills, Media, Paoli, Philadelphia, Newtown Square, and Radnor, Pennsylvania.

19.    Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiffs' communications, including those that contained personally identifiable information, protected health information, and related confidential information. Defendant assisted these interceptions without Plaintiffs' knowledge, consent, or express written authorization.

20.    By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiffs' personally identifiable information and protected health information.

4

## FACTUAL ALLEGATIONS

***The Pennsylvania Wiretapping and Electronic Surveillance Control Act***

21.     The Pennsylvania Wiretapping and Electronic Surveillance Control Act (the "Pennsylvania Wiretapping Act") prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication.  18 Pa. Cons. Stat. § 5703.

22.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretapping Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

23.     Under the Pennsylvania Wiretapping Act, "intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  18 Pa. Cons. Stat. § 5702.

24.     Under the Pennsylvania Wiretapping Act, "contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication."  18 Pa. Cons. Stat. § 5702.

25.     Under the Pennsylvania Wiretapping Act, "person" is defined as "any individual, partnership, association, joint stock company, trust or corporation."  18 Pa. Cons. Stat. § 5702.

26.     Under the Pennsylvania Wiretapping Act, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  18 Pa. Cons. Stat. § 5702.

27.     Pursuant to the Pennsylvania Wiretapping Act, the Commonwealth and any of its officers, officials or employees who may be shielded from liability under the Pennsylvania Wiretapping Act by the doctrine of sovereign immunity waive such immunity.  18 Pa. Const. Stat. § 5725(b).

***Nemours' App and Website***

28.     Defendant offers a full range of pediatric medical services to thousands of infants, children, teens, and young adults.

29.     Complementing these services, Nemours offers the App for download on Android and iPhone devices. The websites that Defendant owns and operates, including, but not limited to, nemours.org and online-scheduling.nemours.org, are accessible on mobile phones, tablets, personal computers, and other Internet-connected devices.

***Facebook's Platform and Business Tools***

30.     Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

creating an account, users must provide their first and last name, along with their birthday and gender.[4]

31.    Facebook sells advertising space by highlighting its ability to target users.[5] Facebook can target users so effectively because it surveils user activity both on and off its site.[6] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[7]   Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[8]

32.    Advertisers can also build "Custom Audiences."[9]   Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[10]   With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[11]   Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply

---

[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[6] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[7] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[8] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[9] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[10] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[11] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

Facebook with the underlying data.  Advertisers can do so through two mechanisms: (a) by manually uploading contact information for customers; or (b) by utilizing Facebook's "Business Tools."[12]

33.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[13]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

34.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, the webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[14]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers

---

[12] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[13] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.
[14] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

can choose, including what content a visitor views or purchases.[15]  Advertisers can even create their own tracking parameters by building a "custom event."[16]

35.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[17]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's websites— Defendant's own code and Facebook's embedded code.

36.     An example illustrates the point.  Take an individual who navigates to Defendant's website and clicks on a tab for medical information.  When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly and concurrently duplicate the communication with the Nemours website at issue, transmitting it to Facebook's

---

[15] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[16] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[17] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

servers, alongside additional information that transcribes the communication's content and the individual's identity.

37.    After collecting and intercepting this information, Facebook processes it, analyzes it and assimilates it into datasets like Core Audiences and Custom Audiences.

***How Nemours Discloses Plaintiffs' and Class Members' Protected Health Information and Assists with Intercepting Communications***

38.    Through the Facebook Tracking Pixel, Nemours – via its App and Website – shares its patients' identities and online activity, including information and search results related to their private medical treatment.

39.    An investigation by *The Markup* revealed that thirty-three of the top 100 hospitals in the United States, as ranked by *Newsweek*, have the Facebook Tracking Pixel embedded on the appointment schedule pages of their websites, among other possible places.[18]   The Nemours Website is one of the identified websites.[19]

40.    According to the Markup Investigation, the hospital websites are "collecting patients' sensitive health information – including details about their medical conditions, prescriptions, and doctor's appointments – and sending it to Facebook."[20]

41.    The Markup Investigation further revealed that the data sent to Facebook is connected to: (a) the IP address of the computer sending the information, providing Facebook with the ability to connect the sensitive information to specific individual or household; or, worse: (b)

---

[18] Todd Feathers, *et al.*, FACEBOOK IS RECEIVING SENSITIVE MEDICAL INFORMATION FROM HOSPITAL WEBSITES, THE MARKUP ("Markup Investigation") (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[19] *Id.*
[20] *Id.*

a specific Facebook user if the user is logged into their Facebook account when using the websites at issue.[21]

42.     The Markup Investigation provided the following examples of the types of information surreptitiously intercepted by Facebook: (a) "clicking the 'Schedule Online' button on a doctor's page [of a specified hospital] prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the search term we used to find her: 'pregnancy termination'"; and (b) clicking the "Schedule Online Now' button on a different website "prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the condition we selected from the dropdown menu: "Alzheimer's."[22]

43.     The startling information revealed in the Markup Investigation prompted a former senior privacy advisor for the U.S. Department of Health and Human Services' Office for Civil Rights ("Office for Civil Rights") to remark on the troubling nature of the conduct: "I am deeply troubled by what [the hospitals] are doing with the capture of [patients'] data and the sharing of it."[23]

---

[21] *Id.*
[22] *Id.*
[23] *Id.*

*How Nemours Discloses Protected Health Information*

44.     Nemours' main website – located at nemours.org – allows patients to select options like "Find a Doctor" and "Nemours App."



45.     When patients click "Find a Doctor," they can search by a doctor's "[n]ame, [s]peciality or [c]ondition."



46.     If a patient clicks on the "Nemours App" button, on nemours.org, they are sent to Nemours' web application – located at app.nemours.org.



47.     There, when users click on the "Menu" button, they are presented with the options to "Find a Location," "Pay My Bill," and "Schedule Office Visit," among others.



48.     Upon clicking "Schedule Office Visit," patients are redirected to a page in which they may either "Continue as Guest" or "Log In to the Nemours App."



49.     After completing either of these options, patients are redirected to the Nemours online scheduling portal – located at online-scheduling.nemours.org. There, they may book appointments with care providers.



50.     Upon information and belief, whenever patients search their treatment or condition, or whenever patients schedule an appointment, Defendant procured Facebook, which intercepts communications that contain protected health information.

51.     Each time Defendant sends this content, it also discloses a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its own Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Facebook admits as much on its website.  Indeed, to find a corresponding profile, a person need only attach the FID to the end of the URL for Facebook, typing in Facebook.com/[FID].

14

52.     A user who accesses Defendant's website while logged into Facebook will transmit what is known as the "c_user cookie" to Facebook, which contains that user's unencrypted Facebook ID.

53.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

54.     One such cookie is the "fr cookie" which contains, at least, an unencrypted Facebook ID and browser identifier.  Facebook, at a minimum, uses the fr cookie to identify users.[24]

55.     If a visitor has never created an account, an even small set of cookies are transmitted.

56.     At each stage, Defendant also utilizes the "_fbp cookie," which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.[25]

57.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[26]  If that happens, the time resets, and another 90 days begins to accrue.[27]

58.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[28]  If that happens, the time rests, and another 90 days begins to accrue.[29]

---

[24] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] Confirmable through developer tools.
[28] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[29] Also confirmable through developer tools.

59.     The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Nemours.[30]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[31]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

60.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sends these identifiers alongside the event data.

61.     Plaintiffs never consented, agreed, or otherwise permitted Nemours to disclose his personally identifiable information and protected health information.  Plaintiffs were never provided with any written notice that Defendant disclosed their or their childrens' protected health information, nor were they provided any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed Plaintiffs' protected health information to Facebook.

62.     By law, Plaintiffs are entitled to privacy in their and their children's protected health information and confidential communications.  Defendant deprived Plaintiffs of their privacy rights by procuring Facebook to intercept these communications by implementing a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other patients' confidential communications, personally identifiable information, and protected health information.  Plaintiffs did not discover that Defendant disclosed their personally identifiable

---

[30] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[31] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

information and protected health information to Facebook, and assisted Facebook with intercepting his communications, until January 2023.

***The Expectation of Privacy in Healthcare Information***

63.     An individual's medical records and information are among the most sensitive type of personal information.

64.     Indeed, the Commonwealth requires that medical records be treated as confidential. 28 Pa. Code § 115.27.

65.     Similarly, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") imposes strict standards to protect sensitive patient health information from being disclosed without the patients' knowledge and consent. *See* 45 C.F.R. § 160, *et seq.*

66.     On December 1, 2022, the Office for Civil Rights issued a bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin") in which it addressed the impropriety of healthcare providers utilizing tracking technologies such as the Facebook Tracking Pixel in a manner that impermissibly discloses protected health information ("PHI") in violation of the HIPAA.[32]

67.     According to the Office for Civil Rights, "**[r]egulated entities** [those to which HIPAA applies] **are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of [protected health information] to tracking technology vendors or any other violations of the HIPAA Rules.**"[33] As set forth in the Bulletin, "disclosures

---

[32] U.S. Dep't of Health and Human Services – Office for Civil Rights, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[33] *Id.* (emphasis in original).

of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[34]

68.    Outside of HIPAA, the Office for Civil Rights warned that an impermissible disclosure of an individual's PHI could result in a wide range of additional harms to the individual or others.[35] "For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or others identified in the individual's PHI."[36]

69.    The Office for Civil Rights noted the broad range of information that constitutes PHI, including "individually identifiable health information" ("IIHI") such as "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code."[37] According to the Bulletin, IIHI can constitute PHI because:

> when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[38]

70.    The Office for Civil Rights concluded that "it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule."[39]

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.* (emphasis in original).

71.     As a result of Defendant's conduct, as alleged herein, Plaintiffs and Class Members have been exposed to the harms and impending harms described in the Bulletin.

72.     Moreover, "courts have recognized the 'growing trend across courts . . . to recognize the lost property value' of personal information." *Calhoun v. Google LLC*, 526 F.Supp.3d 605, 636 (N.D. Cal. 2021) (citing *In re Marriott Int'l, Inc., Cust. Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 461 (D. Md. 2020); *In re Facebook Privacy Litigation*, 557 F.App'x 494, 494 (9th Cir. 2014).)

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs Benjamin Strusowski and Allison Clauges assert this action individually and on behalf of the following class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure ("Class" or "Nationwide Class"): All natural persons in the United States who are, or were, patients of Nemours Children's Health System, or any of its affiliates, and accessed the Nemours app and/or a Nemours website and whose personally identifiable information and/or protected health information was transmitted to Facebook.

74.     Plaintiff Benjamin Strusowski also asserts this action individually and on behalf of the following subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure ("Subclass" or "Pennsylvania Subclass"): All natural persons in the Commonwealth of Pennsylvania who are, or were, patients of Nemours Children's Health System, or any of its affiliates, and accessed the Nemours app and/or a Nemours website and whose personally identifiable information and/or protected health information was transmitted to Facebook.

75.     The Class and Subclass shall be referred to, collectively, as the "Classes."

76.     Plaintiffs reserve the right to amend or modify these Classes' definitions with greater specificity or division and/or to add subclasses after having had an opportunity to conduct discovery.

77.     Excluded from the Classes are: (a) Defendant; (b) any parent, affiliate or subsidiary of Defendant; (c) any entity in which Defendant has a controlling interest; (d) any of Defendant's officers or directors; (e) any successor or assign of Defendant; (f) any judge or court personnel assigned to this case and members of their immediate families; and (g) Plaintiffs' counsel and Defendant's counsel and anyone employed by them.

78.     **Numerosity.**   The Classes are so numerous that joinder of all members is impracticable.  While Plaintiffs do not know the exact number of members of the Classes, Plaintiffs believe the Classed contain at least hundreds of thousands of individuals, and the members can be identified through Defendant's records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

79.     **Commonality.**  Common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Classes.  Common questions include, but are not limited to the following:

   a.   Whether Plaintiffs and Class Members had a reasonable expectation of privacy in their sensitive health information communicated to their healthcare providers;

   b.   Whether Defendant violated Plaintiffs' and Class Members' privacy rights;

   c.   Whether Defendant intentionally tapped the lines of internet communication between Plaintiffs and Class Members and their medical providers;

d.   Whether Nemours' App and Website surreptitiously record personally identifiable information, protected health information and related communications and simultaneously, or subsequently, disclose that information to Facebook.

e.   Whether Facebook is a third-party eavesdropper;

f.   Whether Defendant's disclosure of personally identifiable information, protected health information and related communications constitutes an affirmative act of communication;

g.   Whether Defendant's actions violated the Pennsylvania Wiretapping Act; and

h.   Whether Plaintiffs' and Class Members are entitled to damages under the Pennsylvania Wiretapping Act.

80.   **Typicality.**   Plaintiffs' claims are typical of the claims of the Classes they seek to represent because Plaintiffs and all Class Members have suffered similar injuries as a result of the same practices alleged herein.  Plaintiffs have no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to the Plaintiffs.

81.   **Adequate Representation.**   Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained as their counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

82.   **Predominance.**   Common questions of law and fact predominate over any questions affecting only individual class members.  For example, Defendant's liability and the fact of damages is common to all members of the Class.

83.   **Superiority and Manageability.**   A class action is superior to other available means for the fair and efficient adjudication of this dispute.   The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible.   Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system.   Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system.   A class action, however, presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

84.   **Risk of Inconsistent, Varying, or Prejudicial Adjudications.**   A class action will minimize the risk of inconsistent, varying or prejudicial adjudications.   If Plaintiffs' and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Florida Security of Communications Act**
**Fla. Stat. 934.01, *et seq.***

85.     Plaintiffs Benjamin Strusowski and Allison Clauges repeat the allegations contained in the paragraphs above as if fully set forth herein.

86.     Plaintiffs Strusowski and Clauges bring this Count individually and on behalf of the members of the Nationwide Class.

87.     The Florida Security of Communications Act ("FSCA") prohibits: (1) the interception or procurement of another to intercept any wire, oral or electronic communication; (2) the intentional disclosure of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication; and (3) the intentional use of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication.  Fla. Stat. 934.03(1).

88.     Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, oral or electronic communication in violation of the FSCA is subject to a civil action for: (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  Fla. Stat. 934.10.

89.     At all relevant times, Defendant procured Facebook to contemporaneously track and intercept Plaintiffs' and Class Members' internet communications while navigating the App and/or Website.   Defendant  procured  Facebook  to  contemporaneously  intercept  these

communications without authorization and consent from Plaintiffs Strusowski and Clauges and Class members.

90.     Defendant, when procuring Facebook to intercept Plaintiffs' and Class Members' communications, intended Facebook to contemporaneously learn the meaning of the content of Plaintiffs' and Class Members' communications with Defendant.

91.     Plaintiffs Strusowski and Clauges and Class Members had a justified and reasonable expectation under the circumstances that their electronic communications would not be intercepted.

92.     Plaintiffs Strusowski and Clauges and Class Members were not aware that their electronic communications were being intercepted by Facebook and did not consent to the interception.

93.     In connection with procuring Facebook's contemporaneous interception of Plaintiffs' and Class Members' communications with Defendant, Defendant embedded the Facebook Tracking Pixel on the Website.

94.     The Facebook Tracking Pixel constitutes an electronic or other device through which the contents of a wire, oral and electronic communication can be acquired, including the contents of Plaintiffs' and Class Members' communications with Defendant via the Website.

**COUNT II**
**Violation of the Pennsylvania Wiretapping Act**
**18 Pa. Cons. Stat. § 5701, *et seq.***

95.     Plaintiff Benjamin Strusowski repeats the allegations contained in the paragraphs above as if fully set forth herein.

96.     Plaintiff Benjamin Strusowski brings this Count individually and on behalf of the members of the Pennsylvania Subclass.

97.     The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

98.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

99.     At all relevant times, Defendant procured Facebook to track and intercept Plaintiff Strusowski's and Class members' internet communications while navigating the website that Defendant owns and operates: nemours.org.  They intercepted these communications without authorization and consent from Plaintiff Strusowski and Class members.

100.    Defendant, when procuring Facebook to intercept Plaintiff Strusowski's communications, intended Facebook to learn the meaning of the content the visitor requested.

101.    Plaintiff Strusowski and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

102.    Plaintiff Strusowski and Class members were not aware that their electronic communications were being intercepted by Facebook.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    For an order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

c.    For an order declaring that Defendant's conduct violates the statute referenced herein;

d.    For an order finding in favor of Plaintiffs and the Class on the count asserted herein;

e.    Award compensatory damages, including statutory damages where available, to Plaintiffs and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k.    Grant Plaintiffs and the Class members such further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated:  February 10, 2023

Respectfully submitted,

By: */s/ Paul Costa, Esq.*

**FINE, KAPLAN AND BLACK R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
E-Mail: pcosta@finekaplan.com
PA I.D. No. 87750

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: creilly@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury*
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs and the Putative Class*